THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v. HENRY WEILMUENSTER, Defendant-Appellee.

Second District    No. 2—94—1032

Opinion filed September 16, 1996.

James E. Ryan, Attorney General, of Chicago (Rosalyn B. Kaplan, Solicitor General, Bradley P. Halloran, Arleen C. Anderson, and Steven J. Zick, Assistant Attorneys General, of counsel), for the People.

Daniel M. Kirwan and Dan W. Evers, both of State Appellate Defender's Office, of Mt. Vernon, for appellee.

JUSTICE HUTCHINSON delivered the opinion of the court:

The State appeals from the order of the circuit court of Kane County granting the motion of defendant, Henry Weilmuenster, to dismiss an indictment against him issued by a November 1992 statewide grand jury and originally filed in the circuit court of Cook County on March 18, 1994. We affirm.

On March 22, 1994, the indictment was transferred from the circuit court of Cook County to the circuit court of Kane County for trial. Defendant was charged with one count of calculated criminal cannabis conspiracy (720 ILCS 550/9(b) (West 1992)) and three counts of cannabis trafficking (720 ILCS 550/5.1 (West 1992)). Defendant moved to dismiss the indictment, asserting that he had been granted immunity from criminal prosecution in a Cook County proceeding on June 18, 1993, in return for his testimony before another statewide grand jury. The State responded that, in return for his testimony, defendant had been given only limited "use" immunity (725 ILCS 5/106C—2 (West 1992)) rather than the more complete "transactional" immunity from criminal prosecution (see 725 ILCS 5/106—1 (West 1992)); and that defendant knew "the bounds of the immunity granted to him and agreed to cooperate and testify for the State under a grant of Use Immunity." The State further alleged that the incriminating evidence which led to the indictment against him was

obtained independently from his testimony before the grand jury. After an extensive evidentiary hearing regarding the nature and scope of the immunity promised and given to defendant, on August 5, 1994, the Kane County court (the court) granted defendant's motion and discharged him.

The State timely appeals. The thrust of the State's arguments is that (1) the Cook County circuit court granted use immunity and defendant understood its parameters; (2) no hearing was necessary before the Kane County circuit court; and (3) the Kane County court improperly reviewed the findings of the circuit court of Cook County and overturned its findings. We disagree for the reasons that follow.

## KANE COUNTY PROCEEDING

At the hearing in the Kane County court, defendant testified that, prior to May 13, 1993, Ron Wilson and Ron Bartlett, agents of the Illinois State Police and a drug enforcement agency, visited him while he was incarcerated in the Department of Corrections (DOC) at Taylorville, seeking information during the course of a criminal investigation. Defendant was going to be charged with conspiracy. When asked if he was threatened, defendant testified: "I was told that shit rolls downhill and I do not want to be at the bottom when it all came down." Defendant made a statement to the officers. Another visit took place at the prison on May 13, 1993.

Defendant testified he had been subpoenaed to testify before a statewide grand jury on June 18, 1993. Defendant, who was handcuffed and shackled, was transported by the State Police and others to a Cook County courthouse. The shackles were removed, but he remained handcuffed. He was placed in a holding cell until he was brought before a judge. Prior to that meeting, defendant met with Amy Bertani, an assistant Attorney General, in an office of the courthouse. An officer was present during the meeting. Defendant testified that he was not advised of his right to have an attorney present. When he asked Bertani whether he needed an attorney, she said, "Not at this time." They discussed a grant of immunity. Defendant testified that he was not familiar with the terms "transactional immunity" and "use immunity" and the difference between these types of immunity was not explained to him prior to appearing before the judge.

Defendant further testified that he was brought into a judge's chambers. The judge (Judge Hett) advised defendant of his fifth amendment privilege not to testify and to remain silent. Defendant expected to exercise his right not to testify. The judge explained that defendant could not be prosecuted for what he was about to say. Ber-

tani and the officer were present during this exchange. Defendant testified that he did not ask to have an attorney present because he was told by Bertani that he did not need one at that time; he was going before a judge to have immunity papers signed and he did not need an attorney for that. Defendant believed he was granted immunity from prosecution.

After defendant testified before the statewide grand jury, he was sent back to the penitentiary at Joliet to serve the remainder of his current sentence. Early in 1994, defendant was charged with offenses for which he was arrested and brought before Judge Petersen in the circuit court of Kane County. Defendant told the court he was 33 years old, had an eighth-grade education, and obtained a GED.

On cross-examination, defendant testified that Agents Wilson and Pat Farrey, who interviewed defendant in prison on May 13, 1993, told him not to discuss his conversation with anyone else. Defendant eventually met Bertani and again met with Farrey just prior to testifying before the grand jury. Defendant asked Bertani if he needed a lawyer. He was brought before the judge in chambers. When the judge asked if he was going to invoke his fifth amendment privilege against self-incrimination if he were called before the statewide grand jury, defendant stated that was his intention. When asked if he had a lawyer, defendant said he did not have the money for a lawyer. The judge did not ask if he wanted a lawyer. The judge told him that the prosecution would not be able to use anything he said before the grand jury and that he would have to testify if he were granted immunity. Defendant said he understood that. He acknowledged that he gave up his right to talk to a lawyer. The judge signed an order (of immunity).

When Agents Wilson and Bartlett visited him in prison, they did not tell defendant he would be given immunity if he talked to them. The first time he heard about immunity was from Bertani, just before he testified, after he indicated he would invoke his fifth amendment privilege.

On redirect examination, defendant testified that, when he was brought before the judge in Cook County, he had a conversation with Bertani and Farrey. Farrey stepped out at some point in the conversation. When defendant asked if he needed a lawyer, Bertani said, "Not at this time." Defendant said he was aware that he had a fifth amendment right to remain silent. Defendant said the reason he told the judge he was not looking for a lawyer was because he was told by Bertani that he did not need one at that time. No one explained the immunity to him, and he did not know the difference between transactional and use immunity.

The State moved for a directed finding in its favor, arguing that it was clear that defendant had been given use immunity in the Cook County proceeding. Defense counsel argued that defendant understood he was given transactional immunity from prosecution. The court denied the State's motion.

Assistant Attorney General Lemons conducted the direct examination of Amy Bertani, who was on the drug conspiracy prosecution task force in the Attorney General's office. She testified she first met defendant in a small room at the courthouse in Chicago. Defendant was brought in by the DOC. Special Agent Farrey was present, along with a DOC officer. Bertani explained her position to defendant. Defendant had asked about immunity. She explained what immunity was. She had already prepared a petition and order which she had with her. If defendant invoked his fifth amendment right, she would appear before a judge and ask that defendant be given use immunity. She explained to defendant that whatever he said before the grand jury, "the State cannot use against you in a prosecution." She denied telling him that the Attorney General's office was not going to prosecute him. Defendant appeared to understand this. He asked if he needed a lawyer. She told him that he could have one if he wanted and that one could be appointed. She also said that "the process could occur without that." Defendant continued to talk, indicating he wanted immunity.

When asked if there were any deals regarding defendant's girlfriend, Bertani testified, "I do know it was our intent not to have him serve any more prison time." The girlfriend, Beverly Gibbs, testified and was never charged. Defendant was to let Bertani know if he had any difficulties with his parole officer. Bertani went to Judge Hett's office. A court reporter was present, and the DOC guard brought defendant in. When the judge advised defendant concerning appointment of counsel, defendant said he did not want one. The judge explained use immunity to defendant and signed the order. Defendant then testified before the statewide grand jury.

On cross-examination, Bertani stated that, when she spoke to defendant, she was acting in her capacity as an assistant Attorney General. She said she explained the type of immunity she offered defendant. She could not recall whether she explained what other types of immunity were available. She believed she explained transactional immunity to distinguish it from use immunity. Bertani was shown a motion for an order of immunity dated June 18, 1993, but file stamped June 17, 1994, by the clerk of the circuit court of Cook County—one year later than the date the immunity order was requested. Bertani explained that she could not find the original motion and order. She

contacted Judge Hett, who had signed the original order, and brought him a transcript of the June 1993 proceeding. The later order signed by Judge Hett was dated June 17, 1994. An affidavit signed by Judge Hett and attached to that order was file stamped June 17, 1994. Judge Hett signed the June 17, 1994, order after examining the transcript. The affidavit states that the judge signed an order granting use immunity which was the same as the order he signed on June 18, 1993.

Bertani testified she made it clear to defendant that the immunity did not prevent the State from charging him at a later time but the State could not use his grand jury testimony directly or indirectly against him and that what he had previously told the officer could be used against him. Bertani acknowledged she told defendant she did not intend to have him serve any more prison time.

Defense counsel examined Patrick Farrey as a rebuttal witness. Farrey was employed as an agent of the Illinois State Police from 1987 to October 1993 and was involved in the criminal investigation. He visited defendant in prison in 1993. The State had not given Farrey an opportunity to review his reports before testifying. It was Farrey's understanding that if defendant cooperated with the investigation he would possibly not be prosecuted. He did not recall the exact wording of the conversation with defendant, but it was implied that, if defendant did not cooperate, he would be going back to prison for the offenses Farrey was investigating and for which defendant had not been yet charged. Defendant had information pertinent to the investigation. Farrey knew Bertani as a prosecutor in the investigating unit and was present during dozens of conversations involving Bertani and witnesses. When asked about Bertani's reputation for truthfulness, Farrey answered evasively. When further questioned regarding Bertani's veracity, Farrey stated that he heard statements made by Bertani that were not the way he remembered the situations; this included some testimony he had heard.

Farrey was given an opportunity to review some reports, but he was not given his entire case file; some reports were missing. On cross-examination, Farrey stated he did not recall any documents being present when defendant was interviewed regarding immunity at the Cook County courthouse. He recalled being present during the entire interview. Use immunity was not explained to defendant in Farrey's presence. It was his impression from conversations with his superiors and prosecutors from the Attorney General's office that defendant would not be prosecuted if he cooperated. Farrey admitted he was angry for having been subpoenaed by the State; he was concerned about the loss of income as well as the possibility of being sued civilly. Defendant cooperated fully with Farrey's investigation.

Paul West, who was also indicted, testified that he met Bertani when he was subpoenaed to appear before the statewide grand jury. Bertani promised him that, if he cooperated, he would not be prosecuted or receive any jail time.

In surrebuttal, Bertani denied telling Farrey that defendant would be given complete immunity. She stated she promised West that he would not be subject to jail or prison and that his cooperation would be noted. Bertani testified regarding the arrest of defendant and West. She obtained recognizance bonds (I-bonds) for them in Cook County. However, this procedure was not honored in Kane County, and defendant and West were arrested. Bertani assisted in filing a motion to nol-pros the charges which motion was granted. However, defendant and West were reindicted at a later time. The court inquired what penalty Bertani had in mind in view of the charges being made. She responded that probation or conditional discharge would be sought.

## COOK COUNTY PROCEEDING

The record includes a transcript of the proceeding before Judge Hett in Cook County on June 18, 1993. There, the court advised defendant that the grand jury was investigating possible offenses of cannabis trafficking, calculated criminal cannabis conspiracy, and money laundering. The court informed defendant that the State asked that "I grant you immunity. Use immunity and compel you to testify before the State Wide Grand Jury." The court asked whether defendant had a lawyer and whether he had money to hire a lawyer to advise him in connection with the matter. Defendant replied he did not. The court asked whether defendant was looking for a lawyer to advise him before he was called to testify. Defendant said he was not. The court explained that "use of immunity would prohibit the State from filing any charges or prosecuting you for anything you might say, anything that they can learn as a result of what you say in the Grand Jury." Defendant said he understood. The court explained that, if he lied in testifying, he could be prosecuted for perjury. The following exchange took place.

"THE COURT: You have a right to exercise the 5th Amendment rights. If you do so, *** —if you understand your rights, I am prepared to grant the State's motion for immunity, which would give you immunity from prosecution for anything that you say or things that they could discover as a result of what you say in the Grand Jury.

Do you understand all of that?

DEFENDANT: Yes, sir.

THE COURT: Okay. And do you intend to invoke your 5th

Amendment right, if you appear before the Grand Jury without immunity?

DEFENDANT: Yes, sir.

\* \* \*

THE COURT: Give up your right to consult with a lawyer in connection with this?

DEFENDANT: Yes, I am.

THE COURT: Let the record indicate I believe that Mr. Weilmuenster has knowingly and intelligently waived his right to an attorney. I am convinced that he will exercise his 5th Amendment right to not testify in the absence of an order of immunity. I have explained the details of immunity to Mr. Weilmuenster. It's my opinion that he understands the scope of that order of immunity."

## KANE COUNTY COURT FINDINGS

After the Kane County court heard the arguments of counsel, the court noted that the recreated motion and order for immunity were obtained in a nonadversarial proceeding in June 1994 and did make reference to "use" immunity—if in fact it was an order identical to the original one signed the year before. The court observed that defendant was brought from the penitentiary in chains, had an eighth-grade education, and was unrepresented by counsel. The court found Farrey's testimony truthful and candid. Although Farrey was not given an opportunity to look at his notes, he believed that if defendant testified he would not be prosecuted, but if defendant did not cooperate, he would possibly go to prison on other charges.

The court noted that Bertani interviewed defendant in a custodial setting and told defendant that she did not want him to go to jail. The court was concerned that a defendant be sufficiently and clearly admonished of his rights and of his understanding especially when he is in a custodial setting and unrepresented by counsel, when a grant of immunity is being considered. The court granted defendant's motion.

## ANALYSIS

■ When use immunity is granted, a witness' compelled testimony, or leads derived therefrom, may not be used in his prosecution. Under transactional immunity, the witness is fully immunized from prosecution for any offenses to which his compelled testimony may relate and transactional immunity will not be transmuted into use immunity. *People ex rel. Cruz v. Fitzgerald*, 66 Ill. 2d 546, 549, 550-51 (1977). When statutory transactional immunity is granted in one county, it serves wholly to immunize a person from prosecution in any other local jurisdiction of the State. *Cruz*, 66 Ill. 2d at 551.

The State argues that the grant of a particular type of immunity by one county should be honored and recognized by another county and that one circuit judge may not review and disregard the orders of another circuit judge. The State asserts that Judge Hett explained the type of immunity offered (use immunity) and that defendant understood its scope. Defendant argues, *inter alia*, that the circuit court has the inherent authority to dismiss a criminal prosecution when a violation of due process has been demonstrated.

The difficulty with the State's position is that, without specifically raising the issue here or below, it is indirectly arguing that the doctrine of *res judicata* or collateral estoppel should be applied in its favor. We do not believe that the circuit court of Kane County was "reviewing" or disregarding the orders of another circuit court. Rather, the court examined matters outside the record to determine defendant's understanding of the immunity proceeding, whether he voluntarily consented to limited use immunity, and whether the State made promises which exceeded the findings reflected in Judge Hett's orders. The court was asked to grant a dismissal of the charges based on disputed matters of fact appearing outside the record. See 725 ILCS 5/114—1(a)(3), 1(d) (West 1994).

■ A final judgment may have preclusive effects in a subsequent action under the doctrine of *res judicata* or of collateral estoppel. The doctrine of *res judicata* provides that a final judgment on the merits is conclusive as to the rights of the parties and their privies and, as to them, precludes a subsequent action involving the same claim, demand, or cause of action. *Stratemeyer v. West*, 136 Ill. App. 3d 1095, 1096 (1985). Collateral estoppel is a branch of *res judicata* which precludes relitigating the same issue or a finding on a controlling material fact decided in another, different action between the same parties or their privies. See *Cirro Wrecking Co. v. Roppolo*, 153 Ill. 2d 6, 19-20 (1992); see also *People v. Moore*, 138 Ill. 2d 162, 166 (1990). *Res judicata* precludes relitigation of a single cause of action between two parties, extending to both causes actually litigated and those which might have been, while collateral estoppel is limited to particular facts and issues in common between the prior and subsequent actions which are material to the dispositions of both. *Cirro*, 153 Ill. 2d at 20.

Because it is obvious that the causes of action in Cook County and Kane County were not identical in the present case, the threshold issue before us is whether issue preclusion (*i.e.*, collateral estoppel) should be applied. Because of the unusual circumstances present here, we find that collateral estoppel should not be applied and that defendant was not precluded from relitigating issues in support of his motion to dismiss the indictment.

In deciding whether it would be fair to apply issue preclusion, courts may consider whether the parties were true adversaries and whether the party against whom preclusion is sought was unable, as a matter of law, to appeal the judgment in the initial action. See *Cirro*, 153 Ill. 2d at 21-22. Even where all the usual pleading elements of the doctrine are met, collateral estoppel will not be applied where an injustice would result or when the party against whom the estoppel is asserted did not have a full and fair opportunity and an incentive to litigate the issue in the prior proceeding (*Bulfin v. Eli Lilly & Co.*, 244 Ill. App. 3d 785, 788, 790-91 (1993)) or where relitigation of the issue is warranted by differences in the quality or extensiveness of the procedures followed in the two courts (*People v. Filitti*, 190 Ill. App. 3d 884, 886 (1989)).

■■ In criminal cases, application of the doctrine against a defendant is severely limited, particularly where an issue decided adversely to the defendant will be effectively insulated from review. *People v. Mordican*, 64 Ill. 2d 257, 262 (1976). A defendant may be permitted to relitigate an issue where additional evidence becomes available or where there are "peculiar circumstances." *Mordican*, 64 Ill. 2d at 261. In criminal cases, the doctrine of collateral estoppel should not be applied with a hypertechnical, archaic, 19th century approach, but with realism and rationality. *People v. Mordican*, 33 Ill. App. 3d 196, 200 (1975), *aff'd*, 64 Ill. 2d 257 (1976). Collateral estoppel may be avoided, for example, in a case where the defendant was inadequately represented by counsel, this resulted in the failure to present available evidence, and the overall circumstances show that he was denied a full and fair hearing. See, *e.g.*, *People v. Stiles*, 95 Ill. App. 3d 959, 962-66 (1981). Based on the foregoing principles and the peculiar circumstances of this case, we believe collateral estoppel should not be applied against defendant. Here, defendant was induced to testify before the grand jury under what appear to be coercive circumstances, in a proceeding where he was without the benefit of counsel. There was a gross disparity in the bargaining power of the parties. Defendant was not offered counsel and was led to believe he did not need counsel. The Cook County proceeding was essentially uncontested and lacked truly adversarial safeguards. His ostensible consent to any order of immunity would likely have precluded appellate review. To the extent that the Cook County order could conceivably be viewed as agreed or consensual (though we recognize it is not technically an agreed order), it would not ordinarily be subject to review; however, we believe such an order could be set aside if the order were shown to be the result of misrepresentation, coercion, incompetence, gross disparity in the position or capacity of

the parties, or newly discovered evidence. See *In re Haber*, 99 Ill. App. 3d 306, 309 (1981). If, in fact, defendant mistakenly believed that he had full immunity, he had little incentive to litigate the scope of the immunity from prosecution or to appeal.

Furthermore, we observe that the State appears to have failed to raise specifically the defense of *res judicata* or collateral estoppel and participated fully in relitigating the facts and issues it now contends should not have been considered by the Kane County court; the State has thus waived the issue whether that court improperly reconsidered matters already adjudicated. *Caporale v. Shannon Plumbing Co.*, 20 Ill. App. 3d 511, 513 (1974).

The Kane County court properly considered evidence not previously of record regarding whether the State made other enforceable promises to defendant not to prosecute—which promises were not brought out in the Cook County proceeding. We believe such promises made in return for a defendant's cooperation, if supported by the evidence, may be enforced independently of a statutory grant of immunity. See *People v. Starks*, 106 Ill. 2d 441, 452 (1985); *People v. English*, 31 Ill. 2d 301, 308 (1964); *People v. Smith*, 233 Ill. App. 3d 342, 351 (1992); *People v. Pierson*, 230 Ill. App. 3d 186, 189-91 (1992).

■■ Having determined that issue preclusion will not be applied here because of the peculiar circumstances of this case, we now consider whether the Kane County court's ruling was manifestly erroneous. *Smith*, 233 Ill. App. 3d at 351. A trial court has the inherent authority to dismiss a criminal indictment where the defendant has been denied due process or there would be a miscarriage of justice. *People v. Newberry*, 166 Ill. 2d 310, 313-14 (1995). It is undisputed that defendant fulfilled his part of the agreement to cooperate and to testify before the grand jury. The nature and scope of the State's extrajudicial promises made to defendant and the determination whether defendant knowingly and voluntarily waived his constitutional right to counsel and his privilege from self-incrimination were factual questions which the trial court resolved in favor of defendant after a full evidentiary hearing.

Defendant testified that he was not familiar with transactional and use immunity and the distinctions between them were not explained to him. Defendant was not offered the assistance of counsel and believed he did not need the assistance of counsel based on the State's representations. Acting for the State in her official capacity, Bertani testified she could not recall whether she explained what other types of immunity were available, but believed she had explained the difference between use and transactional immunity. She acknowledged that she told defendant that she would help him

with his parole officer; it was her intent that he not serve any more jail or prison time. The court particularly noted this expressed intent. The court was troubled with the authenticity of the purportedly identical order of immunity signed by Judge Hett in an *ex parte* proceeding one year later. The court clearly had misgivings regarding whether, in a custodial setting and unrepresented by counsel, defendant was sufficiently admonished so as to understand the nature and scope of the immunity he had received.

Farrey, whom the court found truthful and candid, testified that it was his impression defendant would not be further prosecuted if he cooperated. (Farrey's report, dated May 13, 1993, indicates that defendant was cooperating in the hope of avoiding further prosecution and incarceration.) He testified that defendant cooperated fully. Farrey's testimony also tended to impeach that of Bertani.

A defendant's right to due process is clearly implicated when the government makes promises of immunity from prosecution. See *Smith*, 233 Ill. App. 3d at 350-51. Where the evidentiary record discloses ambiguity in the scope of the government's agreement to confer immunity, basic considerations of fairness dictate that any ambiguity in the agreement should be resolved in favor of the defendant. See *People v. Romero*, 745 P.2d 1003, 1010 (Colo. 1987). The problem of possible confusion between transactional and use immunity is not remote. We hold that fundamental fairness requires that a defendant—particularly one unrepresented by counsel—who is called upon to surrender his privilege against self-incrimination in return for a grant of immunity must be *fully and fairly informed by the State of the scope of the protection being afforded*; an oblique or perfunctory reference to the type of immunity offered is insufficient. See *People v. Masiello*, 28 N.Y.2d 287, 292, 270 N.E.2d 305, 308-09, 321 N.Y.S.2d 577, 582 (1971). A court entering an order of immunity must admonish such a defendant carefully of the nature of the rights being waived and of the consequences of defendant's decision to ensure that his decision is made knowingly and voluntarily. See *People v. Lego*, 168 Ill. 2d 561, 564 (1995). The State could easily have avoided the problems presented in this case by reducing the agreement to writing and by being meticulous in its procedures and its representations to the court.

The Kane County circuit court resolved the conflicts in the evidence and assessed the credibility of the witnesses. It could reasonably have found from the evidence that defendant did not understand that he was given only use immunity and that he thought he was consenting to transactional immunity. Alternatively, the court could reasonably have found that defendant was, in fact, given full im-

munity from prosecution based on the oral promises made by the State in return for his cooperation. In either event, the court implicitly concluded it would be unjust to prosecute defendant further under the circumstances. We concur. Therefore, we hold that the court's decision was not manifestly erroneous.

Society reposes in its prosecutors an awesome and sacred trust. They alone possess the authority to institute the sole state-sanctioned process through which a citizen's liberty and life may legally be ended. Not surprisingly, the grant of such staggering power carries with it commensurate responsibilities. Prosecutors have as their preeminent goal not victory, but justice. See, *e.g., People v. Lyles*, 106 Ill. 2d 373, 411-12 (1985) (it is the prosecutor's responsibility to safeguard the constitutional rights of all citizens, including the defendant's); see also 145 Ill. 2d. R. 3.8(b) (prosecutor must disclose exculpatory and mitigating evidence). Without a doubt, prosecutors must discharge their duties with vigor and zealousness. See *United States v. Young*, 470 U.S. 1, 7, 84 L. Ed. 2d 1, 7, 105 S. Ct. 1038, 1042 (1985); see also 134 Ill. 2d R. 1.1, Preamble to Illinois Rules of Professional Conduct. However, prosecutors who—blinded by this zealousness—lose sight of their ultimate goal breach both their ethical code and public trust. They do so at their peril.

The judgment of the circuit court of Kane County is affirmed.

Affirmed.

McLAREN, P.J., and RATHJE, J., concur.